T.C. Memo. 1997-193

UNITED STATES TAX COURT

BEVERLY GORDON, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

RONALD GORDON, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9887-95, 9900-95.          Filed April 24, 1997.

Vincent R. Barrella, for petitioner in docket No. 9887-95.

Ronald Gordon, pro se in docket No. 9900-95.

Rajiv Madan and Anthony J. Kim, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined the following defi-
ciencies in petitioners' Federal income tax:[1]

---

[1]  Respondent issued one notice of deficiency (notice) to both
                                            (continued...)

| Year | Deficiency |
|------|------------|
| 1988 | $88,979 |
| 1989 | 18,979 |
| 1990 | 1,330 |

The issues remaining for decision are:

(1)  Are petitioners Ronald Gordon (Mr. Gordon) and Beverly Gordon (Ms. Gordon) entitled to a net operating loss deduction for 1988 that is attributable to an alleged net operating loss carryover from their taxable year 1986?  We hold that they are not.

(2)  Is respondent equitably estopped from claiming that petitioners are not entitled to a net operating loss deduction for 1988?  We hold that she is not.

(3)  Is Ms. Gordon entitled to innocent spouse relief under section 6013(e)(1)[2] with respect to the understatement of tax for 1988 that is attributable to the net operating loss deduction that petitioners claimed for that year?  We hold that she is not.

FINDINGS OF FACT

Most of the facts have been stipulated and are so found.

Mr. Gordon and Ms. Gordon resided in New York, New York, at

---

[1]  (...continued)
petitioners, each of whom filed a separate petition with the Court.  The two cases were consolidated for purposes of trial and opinion, but not for purposes of briefing.

[2]  All section references are to the Internal Revenue Code (Code) in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

the time their respective petitions in these cases were filed. (Mr. Gordon and Ms. Gordon are sometimes referred to as the Gordons.)

The Gordons were married on April 2, 1959, separated during March 1991, and divorced on July 14, 1994. They have two children, a daughter Jodi and a son Eric.

Mr. Gordon

Throughout most of the period 1965 through 1996, Mr. Gordon, who majored in accounting, held a bachelor's degree in business administration, and was licensed by the National Association of Security Dealers (NASD) to sell securities to the public, earned his livelihood as a trader either for his own account or for the accounts of the various investment or securities firms (firms) that employed him. A trader is a professional investor in securities, commodities, or options, who is in the trade or business of buying and selling such products, with the aim of profiting from increases in the market prices of his or her positions.

Mr. Gordon's compensation as a trader for the firms that employed him was based on a percentage of the profits that his trading activities generated for those firms, and not on a fixed salary. Those firms generally protected themselves against any losses incurred by traders whom they employed by requiring them to deposit money as security for any such losses and/or by retaining for a certain period of time a portion of the compensa-

tion to which those traders were entitled.

At various periods of time during the years 1965 through 1996, Mr. Gordon, acting as either a floor trader (i.e., one who is, or is employed by, a member of a securities or commodities exchange and who trades on the floor of such an exchange for his or her own account or for the account of his or her employer) or an upstairs trader (i.e., one who executes such trades off the floor of such an exchange from his or her office) traded options for his own account or for the accounts of the various firms that employed him. An option is a contract under which (1) the buyer or holder has the right, but not the obligation, for a specified period of time to buy (i.e., call option) or sell (i.e., put option) a specified portion of the underlying interest (e.g., stocks, bonds, or commodities) at a fixed or determinable price and (2) the seller or writer is obligated to perform if the buyer or holder exercises the option.

A trader on the floor of an exchange who buys and sells options acts as either a market maker, a specialist, or a floor broker. Such a trader who acts as a market maker (options market maker) buys and sells options on the floor of an exchange either for his or her own account or for the accounts of others, competes with other options market makers to make a market in various options that are traded on that exchange, is registered with that exchange as a market maker in options, and is registered with the Securities and Exchange Commission (SEC) as a

broker/dealer.  A trader on the floor of an exchange who acts as a specialist in buying and selling options buys and sells options either for his or her own account or for the accounts of others, has less competition than an options market maker, is assigned to a particular option class or classes for which he or she is obligated to make a market, does not compete with other specialists in those option classes to which he or she is assigned, is the principal dealer responsible for making a market in the options in which he or she specializes, is registered with that exchange as a specialist in options, and is registered with the SEC as a broker/dealer.  A trader on the floor of an exchange who acts as a floor broker in buying and selling options executes orders for others on the floor of that exchange, including orders for options market makers.

Throughout the period 1965 until sometime in 1969, First Hanover employed Mr. Gordon as a broker/trader for listed securities.  As a broker, he sold listed securities to the public.[3]

Throughout the period that commenced sometime in 1969 until sometime in 1976, Mr. Gordon acted as an upstairs trader of securities listed on the New York Stock Exchange (NYSE) and the American Stock Exchange (AMEX) for the account of Chartered New England, a partnership that he and seven other individuals had

---

[3]  The record does not disclose whether Mr. Gordon also acted as a trader for First Hanover throughout the period 1965 until sometime in 1969.

organized in 1969.

Throughout the period that commenced sometime in 1976 until sometime in 1981, Mr. Gordon traded securities, commodities, and options for his own account.[4]

Throughout the period that commenced sometime in 1981 until sometime in 1982, Bear, Sterns employed Mr. Gordon as a stockbroker of listed securities, and, as such, he sold listed securities to the public.

Throughout the period that commenced sometime in 1982 until sometime in 1983, Mr. Gordon traded futures on the New York Futures Exchange for his own account.[5]

Throughout the period that commenced sometime in 1983 until sometime in 1984, Mr. Gordon was employed by Rosenkrantz, Ehrenkrantz, Lyons, and Ross to act for its account as an upstairs trader of listed securities.

Throughout the period that commenced sometime in 1984 through 1985, Moore and Schley, Cameron and Co. Securities (Moore), a firm that owned a seat on the AMEX, employed Mr. Gordon to act for its account as an options market maker and paid him Form W-2 wages (W-2 wages) for those services that were based on a percentage of the profits that he generated for that firm.

---

[4] The record does not disclose whether Mr. Gordon acted as an upstairs trader or as a floor trader during that period.

[5] The record does not disclose whether Mr. Gordon acted as an upstairs trader or as a floor trader during that period.

On December 31, 1985, Mr. Gordon purchased a seat on and became a member of the AMEX by purchasing an option-trading permit from Moore.  Thereafter, during 1986 Mr. Gordon, who was registered with the SEC as a broker/dealer, registered with and operated on the AMEX as a market maker in stock options (i.e., options in which the underlying interest is stock) and index options (i.e., options in which the underlying interest is an index that is the measure of the value of a group of stocks or other securities).[6]  All of those options were listed and traded on the AMEX and subject to the respective rules and regulations of that exchange and the SEC.

As an options market maker, during 1986 Mr. Gordon (1) was obligated to comply with the respective rules and regulations prescribed by the SEC and the AMEX, (2) was required to provide liquidity for customer orders to be filled on the AMEX, (3) was obligated to create a market in options by offering simulta-neously to buy and sell options at a particular price for certain stock, and (4) was required to make bids and offers in all option classes consistent with a fair and orderly market.  As an options

---

[6]  In the "Stipulation of Facts as to Ronald Gordon", Mr. Gordon and respondent interchangeably referred to Mr. Gordon's activi-ties during 1986 on the AMEX as a market maker in stock options and index options for his own account as his activities as (1) a "market maker", (2) an "option market maker", (3) "a dealer in equity options", and (4) a "listed equity options market maker". We shall refer to Mr. Gordon's activities during 1986 on the AMEX as a market maker in stock options and index options for his own account as his activities as an options market maker.

market maker, during 1986 Mr. Gordon had the opportunity to stand at a post on the AMEX trading floor, where buyers and sellers in a particular option are concentrated and where trades occur by open outcry, and to participate in public orders that came into that post.  For example, as an options market maker, during 1986 Mr. Gordon may have been obligated to provide a bid price for an option on a particular stock, and traders on the floor of the AMEX could go to him either to buy or sell options at that bid price.

As an options market maker, during 1986 Mr. Gordon purchased a particular option at a certain bid price, owned that option for his own account, and expected to sell it at a slightly higher offered price.  As such, Mr. Gordon took a position, that is, held an option, with a profit expectation derived from the fluctuations in the market.  A great deal of Mr. Gordon's trading activity as an options market maker during 1986 was in options on the stock index, XMI.  XMI is a stock index gauging the top 20 capitalized stocks on the NYSE.

During 1986, Mr. Gordon bought and sold over 50,000 option contracts in the normal course of his trade or business as an options market maker, and he did not identify any of those trades in options as a hedging transaction.  All of the options that Mr. Gordon traded during that year were marked to market contracts. During 1986, Mr. Gordon was not a specialist on the NYSE who made a market in the stocks underlying the options that he traded.

During 1986, Mr. Gordon used Wagner Stott Clearing Corporation (Wagner Stott) as one of his clearing organizations. A clearing organization like Wagner Stott provides financing to, and sets margin requirements for, its clearing members. All standardized security options are issued and guaranteed by clearing organizations like Wagner Stott that are regulated by the SEC. During 1986, Wagner Stott provided Mr. Gordon with financing to trade during that year.

Wagner Stott issued statements (Wagner Stott statements) to Mr. Gordon during 1986 that reflected, inter alia, his trading activity as an options market maker. The Wagner Stott statements for the periods March 27, 1986, through May 30, 1986 (April-May 1986 Wagner Stott statements) and October 31, 1986, through November 28, 1986 (November 1986 Wagner Stott statement)[7] showed Mr. Gordon's trading activities as an options market maker in various stock options and stock index options. The April-May 1986 Wagner Stott statements also showed Mr. Gordon's opening and closing balances with respect to stocks of the following corporations: American Can, AMR, Cetus, Digital Equipment, Gould, Home Shopping Network, J.C. Penney, Merrill Lynch, Motorola, National Distillers & Chem, and Union Carbide. The November 1986 Wagner Stott statement did not show opening or closing balances with respect to any stocks.

---

[7] The Wagner Stott statements identified above are the only Wagner Stott statements that are part of the record.

During 1986, Mr. Gordon sustained a total net loss of $319,973 (net trading loss) from his activities as an options market maker.[8]  Because of that loss, Mr. Gordon owed Wagner Stott approximately $185,000, which he was unable to repay.  He instead agreed that Wagner Stott sell his AMEX seat, which it did for $249,000 on January 19, 1987.  Wagner Stott applied those sale proceeds to the amount that Mr. Gordon owed it and remitted the difference to Mr. Gordon.

Sometime between January and July 1987, Mr. Gordon and another individual formed a partnership that operated under the name Ronald Gordon and Company (partnership) and that leased a seat on the AMEX for a six-month period that commenced on July 24, 1987, and terminated on January 21, 1988.  Mr. Gordon oper-ated as an options market maker on the AMEX on behalf of that partnership for a one-month period between July and October 1987 during which losses were sustained.  The partnership terminated its lease of the AMEX seat prior to the expiration of its lease term.

Throughout the period that commenced sometime in October 1987 until sometime in January 1988, Mr. Gordon was employed by Drexel, Burnham, Lambert as an upstairs trader.

Throughout the period that commenced sometime in January 1988 until sometime in 1989, Mr. Gordon was employed by MKI

---

[8]  The record does not disclose the gain or loss that resulted from each option that Mr. Gordon traded during 1986.

Securities, Inc. (MKI) as an upstairs trader for listed securities and received W-2 wages that were based on a percentage of the profits that he generated for that firm. Mr. Gordon deposited $25,000 with MKI as security, $11,000 of which was retained by MKI to cover the losses that Mr. Gordon incurred when he traded for that firm.

During 1989, Mr. Gordon was employed by First New York Securities as an upstairs trader.

Throughout the period that commenced sometime in 1990 until sometime in early 1991, Mr. Gordon was employed by Schoenfeld Securities (Schoenfeld) as an upstairs trader and received W-2 wages that were based on a percentage of the profits that he generated for that firm. Mr. Gordon deposited an undisclosed amount with Schoenfeld as security, $47,000 of which was retained by that firm to cover the losses that Mr. Gordon incurred when he traded for that firm.

During 1992, Mr. Gordon was employed as an account executive by Merrill Lynch in Palm Beach, Florida.

Throughout the period that commenced sometime in 1993 until at least the date of the trial herein, Mr. Gordon was again employed by Schoenfeld as an upstairs trader and was compensated in the same manner as he had been when he worked there during 1990 and 1991.

Ms. Gordon

Ms. Gordon received a bachelor's degree in education and in English in 1955 and a master's degree in psychology and in remedial reading in 1959. She also has taken courses in various other subjects, including teaching methods and humanities.

Throughout the period that commenced sometime in 1955 until sometime in 1965 and throughout 1971 and 1972, Ms. Gordon was employed as a school teacher.[9]

Throughout 1976 and 1977, Ms. Gordon was employed as an ice-skating instructor.

Throughout the period that commenced on January 5, 1979, until August 31, 1982, Ms. Gordon worked part-time as a registered representative with First Investors Corporation (FIC), a mutual fund broker/dealer, and, as such, she sold certain mutual funds for FIC and received commissions from FIC for selling such funds. As a registered representative with FIC, Ms. Gordon (1) was required and trained by FIC to pass, and did pass, the NASD Series-Six licensing examination, (2) attended training programs that were provided by FIC on, inter alia, the mutual funds that FIC offered to the public, the sales practices that its employees were to use in selling such funds, and the suitability of such funds for each potential client of FIC in light

_____

[9] With one exception that is noted below, the record does not disclose whether Ms. Gordon was employed on a full-time or a part-time basis during the periods that are specified herein.

of that potential client's investment goals, and (3) was responsible for explaining to each potential client of FIC the differences among the various financial investments that were available through FIC and for assessing the suitability of such investments for each such potential client.

Throughout the period that commenced sometime in 1979 until sometime in 1981, Ms. Gordon was also employed as a salesperson by a retail store.

Throughout the period that commenced sometime in 1982 until at least the date of the trial herein, Ms. Gordon was employed as a school teacher.

During 1982, Ms. Gordon inherited from her mother assets valued at about $200,000 that consisted of stocks, mutual funds, and cash. Ms. Gordon invested the cash that she inherited in various interest-bearing accounts, including money market funds, certificates of deposit, and savings accounts.

During 1988, 1989, and 1990, respectively, Ms. Gordon maintained 16, 21, and 18 separate financial accounts that consisted of money market funds, certificates of deposit, savings accounts, and checking accounts.

During 1979, after Ms. Gordon began working for FIC, she purchased stock of certain of the mutual funds offered by that company and continued to own that stock through 1989.

On February 26, 1987, Ms. Gordon opened a brokerage account with Charles Schwab & Co., Inc. (Charles Schwab) that she main-

tained at least through 1993.  Sometime after February 26, 1987, but prior to December 31, 1987, she submitted an application to Charles Schwab to add options trading to her Charles Schwab brokerage account.  In that application, Ms. Gordon indicated, inter alia, (1) that she had 10 years of investment experience that consisted of engaging during each such year in 10 stock transactions ranging from $5,000 to $15,000 and (2) that she had "Good", rather than "Limited" or "Extensive", investment knowledge.  Charles Schwab approved that application and provided to Ms. Gordon two form disclosure documents entitled "What You Should Know About Option Trading at Schwab" and "Characteristics and Risks of Standardized Options".  During all relevant periods, Charles Schwab issued monthly statements to Ms. Gordon reflecting her account activity.

During all relevant periods, Ms. Gordon occasionally purchased and sold stocks of various corporations (e.g., Compaq Computer, Mylex, and General Electric).  During the latter part of 1987, based on Mr. Gordon's advice, Ms. Gordon, who at that time owned the stock of Compaq Computer Corporation, sold for $55 each two Compaq Computer call options with expiration dates of February 20, 1988, that were not exercised.

During all relevant periods, Ms. Gordon, who had an understanding of some of the financial products bought and sold in financial markets by investors, managed her own investments and reviewed the account statements issued to her in order to keep

track of her investments (e.g., determine the value of her stocks).

At least for all relevant periods since 1982, Ms. Gordon generally held any asset that she acquired, including the assets that she inherited from her mother during 1982 and any income produced therefrom, exclusively in her own name, and not in joint names with Mr. Gordon. She did so in order to protect those assets against the risks that were associated with the volatility of Mr. Gordon's business activities.

The Gordons' Sale of the Roslyn
Residence and the Purchase of
the Lincoln Plaza Residence

On November 21, 1986, the Gordons sold for $514,000 their principal residence in Roslyn, New York (Roslyn residence) and realized a gain from that sale. The Gordons used those sale proceeds in the following manner: (1) An undisclosed amount was used to pay certain unidentified debts and certain costs and expenses that were associated with the sale of the Roslyn resi- dence; (2) $100,000 was used to pay off a mortgage loan ($100,000 mortgage loan) on the Roslyn residence that the Gordons had obtained during 1986 for Mr. Gordon to use in his business activities; and (3) the remaining amount was divided equally between Mr. Gordon and Ms. Gordon.

Throughout the period November 1986 until November 9, 1988, the Gordons rented for $2,350 a month a condominium located at One Lincoln Plaza Condominiums in New York City. Ms. Gordon was

aware of that monthly rent.

The accounting firm of Braunstein & Stern (B&S) advised the Gordons to purchase another principal residence after the sale of the Roslyn residence in order to defer the recognition of the gain from the sale of the Roslyn residence by satisfying the requirements of section 1034.

On November 9, 1988, the Gordons purchased for $420,000 and titled in both their names another condominium located at One Lincoln Plaza Condominiums (Lincoln Plaza residence). The Gordons financed that purchase with (1) cash of $100,000 which Ms. Gordon provided and for which Mr. Gordon reimbursed her shortly thereafter and (2) a mortgage loan of $320,000 on which the Gordons were jointly liable and which required payments of that amount on or before November 9, 1993, and monthly interest calculated at 10 percent annually. The $100,000 in cash that Mr. Gordon paid when the Gordons purchased the Lincoln Plaza residence made Ms. Gordon whole with respect to the Gordons' using $100,000 of the proceeds from the sale of the Roslyn residence to pay off the $100,000 mortgage loan on that residence that Mr. Gordon utilized in his business activities. The Gordons' total monthly payment for the Lincoln Plaza residence was, and Ms. Gordon was aware that it was, approximately $3,000.

The Gordons' Marriage, Lifestyle,
and Household Expenses

Throughout their marriage until some point prior to their

separation, (1) Mr. Gordon and Ms. Gordon had a trusting relationship; (2) they communicated openly with each other concerning personal and certain professional matters; (3) they did not conceal assets or losses from each other; (4) Ms. Gordon was aware that Mr. Gordon's business involved trading options and securities and was extremely volatile; (5) Ms. Gordon generally knew whether Mr. Gordon had a successful or an unsuccessful trading day; and (6) Ms. Gordon knew about Mr. Gordon's job changes and was at times consulted by him as a sounding board for his career moves.

Ms. Gordon was aware that Mr. Gordon suffered a major trading loss for 1986.

During 1986 through 1990, the Gordons had a comfortable, upper-middle class lifestyle that was fully consistent with their lifestyle prior to 1986. By way of illustration of their lifestyle during their marriage, (1) the Gordons (a) were charter members of the Old Westbury Golf & Country Club located in Long Island, New York, for which they paid annual dues of approximately $10,000, (b) took at least one annual family vacation that cost approximately $4,000, and (c) owned various automobiles, including a Porsche, a Mercedes Benz 500 SEL, a Chrysler, a Cadillac, and a Ford Taurus; and (2) Ms. Gordon (a) regularly took spa vacations that cost between $1,700 to $2,500 per trip and (b) owned five fur coats, one of which, a mink coat, she purchased during 1988 for approximately $8,000 and for which Mr.

Gordon reimbursed her.

During their marriage, the Gordons had the understanding by which they generally abided that Mr. Gordon was solely responsible for paying all major household expenses that they incurred, including their Federal and State income tax liabilities (household expenses). Starting in 1986, as circumstances forced Mr. Gordon to rely on Ms. Gordon's assets to maintain the lifestyle to which they had become accustomed, Ms. Gordon became more active in household finances and advanced the funds necessary to pay certain household expenses in order to maintain that lifestyle. That situation continued through 1990, by which time Ms. Gordon was using her own assets to pay both major and minor household expenses. The Gordons agreed that the funds that Ms. Gordon advanced for the payment of household expenses were loans to Mr. Gordon by her (household expense loans) that he would repay.

During 1987, 1988, 1989, and 1990, Ms. Gordon paid household expenses of at least $44,240, $6,600, $51,000, and $51,236, respectively. By way of illustration of the household expenses that Ms. Gordon paid, (1) during 1989 Ms. Gordon paid $20,000 and $5,000 to the Internal Revenue Service (IRS) and the State of New York, respectively, with respect to the Gordons' joint Federal and State income tax liabilities for 1988; and (2) during 1990 Ms. Gordon paid $5,816 for real estate taxes and an undisclosed amount for country club membership dues and credit card charges

as well as monthly expenses of (a) $3,000 for the mortgage loan and maintenance on the Lincoln Plaza residence, (b) $325 for garage space, and (c) $460 for the lease of a car.

Mr. Gordon repaid Ms. Gordon at least $14,240 of the household expense loans by allowing her to retain a Federal income tax refund in that amount received around July 1990 that the Gordons claimed in their joint Federal income tax return (return) for 1989. Mr. Gordon did not repay all the household expense loans.

The Gordons' 1983 Through 1990
Returns and the IRS Examination
of Their 1986 and 1988 Returns

Mr. Gordon, who had some knowledge of the Federal income tax laws based on conversations that he had with his colleagues and other professionals, and Ms. Gordon, who did not have much knowledge of those laws, filed a joint return for each of the years 1983 through 1990 and amended returns for 1986 and 1988. With the exception of the 1990 return which was prepared by Bonnie Wolpe (Ms. Wolpe), all of those returns were prepared by B&S. The date April 15, 1987, appeared next to the signature line in the Gordons' 1986 return. The original return that the Gordons filed for 1988 was destroyed by the IRS as part of its record retention policy.

Ms. Gordon knew that she was obligated to file returns and that B&S and Ms. Wolpe, respectively, prepared the Gordons' 1983 through 1989 returns and the 1990 return. Ms. Gordon participated in the preparation of those returns by providing Mr. Gordon

with information relating to the income that she received during 1983 through 1990 (e.g., Forms W-2 and 1099) and the expenses that she paid during those years (e.g., canceled checks for charitable contributions). Ms. Gordon relied on B&S and Mr. Gordon for the preparation of the 1983 through 1989 returns. Although Ms. Gordon had the opportunity to review those returns, she did not. Except for discussions with Mr. Gordon about certain important items reported in the Gordons' 1986 through 1989 returns, such as the gain from the sale of the Roslyn residence, Ms. Gordon did not discuss those returns with Mr. Gordon or B&S. Because she was not available at the time the 1986, 1987, and 1989 returns and the 1986 amended return were filed, Ms. Gordon did not sign them; instead, Mr. Gordon signed Ms. Gordon's name to those returns.

The Gordons' 1983 through 1990 returns listed the respective occupations of Mr. Gordon and Ms. Gordon as securities trader and teacher. The Gordons reported the results of Mr. Gordon's activities as a securities trader in Schedules C of their returns for 1983 through 1986, 1989, and 1990, regardless whether those results related to his activities as a securities trader for his own account or to his activities as a securities trader for the accounts of the firms that employed and paid him W-2 wages. In their 1987 and 1988 returns, the Gordons reported the results of Mr. Gordon's activities as a securities trader for the accounts of the firms that employed and paid him W-2 wages as "Wages,

salaries, tips, etc." The results of Mr. Gordon's activities as a securities trader for 1983 through 1990 that were reported in the returns for those years ranged from income of $345,714 for 1988 to a loss of $324,723 for 1986. Ms. Gordon's income from her activities as a teacher for 1983 through 1990 that was reported as "Wages, salaries, tips, etc." in the Gordons' returns for those years ranged from $19,822 for 1983 to $37,056 for 1989.

In Schedule C of their 1986 return, the Gordons reported a loss of $324,723 (1986 claimed Schedule C loss) that consisted of the net loss of $319,973 that Mr. Gordon sustained from trading options on the AMEX as an options market maker and expenses of $4,750 that he incurred in connection with that trading activity. Based upon discussions with B&S, it was Mr. Gordon's understanding that his 1986 net trading loss of $319,973 should be treated as an ordinary loss in the Gordons' 1986 return. The Gordons treated the 1986 Schedule C loss of $324,723 as an ordinary loss in their 1986 return, used it to reduce $47,724 of income reported in that return, and showed the balance of $276,999 of that loss on page 1 of that return as "total income".

In a statement that was attached to their 1986 return, the Gordons indicated that they had incurred a net operating loss for 1986 in an undisclosed amount and that, pursuant to section 172(b)(3)(C), they were making an election to relinquish the carryback of that loss.

The Gordons reported in Form 2119 (Sale or Exchange of

Principal Residence) (Form 2119) that was included as part of their 1986 return that they sold the Roslyn residence for $500,000, had a basis in it of $155,500, realized a gain of $344,500 from its sale, and planned to replace it within the "replacement period". Consequently, the Gordons did not include any portion of that gain in the income that they reported in their 1986 return.

In a statement that was attached to their 1987 return, the Gordons indicated that they had incurred a net operating loss for 1987 in an undisclosed amount and that, pursuant to section 172(b)(3)(C), they were making an election to relinquish the carryback of that loss.

During August 1987, the IRS initiated an examination of the Gordons' 1986 return. Around 1988, a revenue agent met with B&S and examined the Gordons' 1986 return and certain documents relating to that return that B&S had maintained. He also requested a meeting with Mr. Gordon in order to discuss his 1986 net trading loss. Based on her conversations with Mr. Gordon, Ms. Gordon was aware that the 1986 return was being examined by the IRS. On October 14, 1988, Mr. Gordon met with the IRS revenue agent who was examining the Gordons' 1986 return and described to him the nature of his activities as an options market maker on the AMEX. At the conclusion of that meeting, that agent told Mr. Gordon that his 1986 net trading loss was properly treated as an ordinary loss in the Gordons' 1986 return

and that he was allowing the claimed deduction in that return with respect to that loss. Mr. Gordon related that information to Ms. Gordon. On May 1, 1989, the IRS issued a letter (no-change letter) to the Gordons formally notifying them that the examination of their 1986 return showed that "no change" was necessary in the tax reported in that return.

On December 7, 1988, the IRS received the Gordons' 1986 amended return that included an amended Form 2119. In their 1986 amended return, the Gordons included in their income a capital gain of $29,391 from the sale of the Roslyn residence, claimed a net operating loss deduction of $35,065 that was attributable to an alleged net operating loss carryover from their taxable year 1985, and reported that the loss reported in their 1986 return was increased by $5,674 from $276,999 to $282,673. In calculating the capital gain from the sale of the Roslyn residence that was reported in the Gordons' 1986 amended return, the Gordons (1) indicated in that amended return and/or the amended Form 2119 that was included as part of that return that they (a) sold the Roslyn residence for $500,000, (b) had a basis in that residence, as adjusted by the IRS on audit, of $120,500, rather than $155,500, (c) consequently realized a gain of $379,500, rather than $344,500, from the sale of that residence, and (d) replaced that residence with the Lincoln Plaza residence; and (2) took account of, inter alia, the purchase price of the Lincoln Plaza residence in arriving at the portion of the capital gain from the

sale of the Roslyn residence that should be included in their income for 1986.

In their 1988 return, the Gordons reported as ordinary income the wages of $379,071 that MKI had paid to Mr. Gordon during that year and claimed a net operating loss deduction of $268,318 (claimed 1988 NOL deduction) that was attributable to Mr. Gordon's 1986 net trading loss that they claimed in their 1986 return.

In their 1989 and 1990 returns, the Gordons did not claim any net operating loss deductions.

During 1992, the IRS initiated an examination of the Gordons' 1988 return. The IRS revenue agent examining that return examined, inter alia, the claimed 1988 NOL deduction. Because that claimed deduction was attributable to Mr. Gordon's 1986 net trading loss, that agent reexamined that loss after having notified the Gordons in writing of his intention to do so. Based on that reexamination, the revenue agent concluded that Mr. Gordon's 1986 net trading loss constituted a capital, and not an ordinary, loss and that, consequently, that loss did not result in a net operating loss for 1986, and the Gordons were not entitled to the claimed 1988 NOL deduction.

The Gordons' Separation and
Their Separation Agreement

The Gordons separated in March 1991. Thereafter, Mr. Gordon moved out of the Lincoln Plaza residence.

Around 1992, after the Gordons had separated, Chemical Bank seized a bank account and sealed a safe deposit box, both of which were held in the joint names of Mr. Gordon and Ms. Gordon, and refused to release them until satisfaction of a judgment that it had against Mr. Gordon with respect to the unpaid portion of a $25,000 business loan that he had obtained. In order to obtain the release of those assets, Ms. Gordon made a payment to Chemical Bank around 1992 in satisfaction of that outstanding judgment.

In September 1992, the Gordons entered into a separation agreement (separation agreement) that provided, inter alia:

> 3. <u>Distribution of Certain Property</u>. The condominium apartment which was the marital residence of the parties was transferred to the sole ownership of Beverly Gordon on July 2, 1992. In settlement of their mutual claims to marital and separate property, the parties agree that all right, title and interest thereon and any and all equity therein shall belong to Beverly and any and all responsibility for the mortgage thereon shall belong to Beverly.

> 4. <u>Distribution of Certain Personal Property</u>.

> A. * * * The parties agree that [certain] * * * articles of personal property currently in the possession of each of them * * * shall * * * be owned exclusively by the party presently in possession * * *

> B. Each of the parties has an interest in certain retirement and/or deferred benefit plans. Each of the parties hereby waives any right or interest in such plans or with respect to the receipt of benefits in such plans owned by the other party and confirms that such plans and the benefits therefrom shall be the sole and exclusive property of the current title owner thereof. * * *

C.   In the course of the marriage, Beverly acquired by gift or inheritance certain personal property including but not limited [to] cash or cash equivalents and securities.  Ronald acknowledges and agrees that said property has been and will continue to be the sole and absolute property of Beverly.

*      *      *      *      *      *      *

6.   Mutual Release and Discharge of General Claims.  Except as otherwise expressly set forth herein, each party hereby remises, releases, and forever discharges the other from all causes of action, claims, rights, and demands whatsoever, in law or in equity, known or unknown, past, present, or future, which either of the parties hereto ever had, or now, or hereafter may have, against the other, * * *

7.   Responsibility for Debts.   * * * Ronald hereby acknowledges and agrees that Beverly paid the sum of $5,000.00 on June 30, 1992 to Chemical Bank as and for a partial payment on a debt of approximately $24,000.00 which is the sole and absolute responsibility of Ronald.  In consideration thereof, Ronald agrees to indemnify and repay Beverly the $5,000.00 debt payment plus $500.00 for her expenses in settling the litigation thereon.  Said payment of $5,500.00 shall be made in eighteen installments of $300.00 per month and a final payment of $100.00 commencing Oct. 15, 1992 and lasting through March 15, 1994.  Said payments shall be by check or money order and mailed to Beverly by the 15th day of each month.

A handwritten addition by Mr. Gordon to paragraph 7 of the separation agreement that was initialed by Ms. Gordon stated: "This paragraph is based on the premise that I remain gainfully employed."  Mr. Gordon paid a total of only $1,800 to Ms. Gordon sometime around 1992 pursuant to paragraph 7 of the separation agreement.

The separation agreement did not provide for any spousal support payments to be made by Mr. Gordon to Ms. Gordon because

Mr. Gordon was not financially capable of making any such payments.

In July 1993, the Gordons executed an amendment to the separation agreement under which they agreed, inter alia, that any "tax liabilities that may be assessed" against them in connection with their joint tax liabilities shall be "the sole and absolute responsibility" of Mr. Gordon.

After the Gordons separated, Ms. Gordon was responsible for and paid the mortgage loan on the Lincoln Plaza residence and all her own living expenses. The sources of those payments were Ms. Gordon's salary, the dividends on stocks that she owned, and the proceeds from the sale of some of her assets.

### OPINION

Petitioners bear the burden of proving that respondent's determinations in the notice are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

### The Claimed 1988 NOL Deduction

#### Section 1256

During 1986, Mr. Gordon sustained a net loss of $319,973 from trading options on the AMEX as an options market maker.[10]

---

[10] The parties agree that the amount of Mr. Gordon's 1986 net trading loss that is in question is $319,973 and that that trading loss does not include the expenses of $4,750 that the Gordons reported in Schedule C of their 1986 return as having been incurred in connection with Mr. Gordon's trading activity during that year.

The Gordons claimed that net trading loss as an ordinary loss in their 1986 return and claimed a net operating loss deduction of $268,318 in their 1988 return that is attributable to the carry-over of that loss.

Mr. Gordon contends, and respondent disputes, that the Gordons are entitled to the claimed 1988 NOL deduction because the net trading loss that Mr. Gordon sustained during 1986 is an ordinary, and not a capital, loss.[11]

To support his contention that his 1986 net trading loss is an ordinary loss, Mr. Gordon asserts:

> [As a market maker, I was] trading for profitable opportunities. * * * But at the same times [sic], * * * [I had] a dual purpose and dual function.
>
>     *     *     *     *     *     *     *
>
>    * * * As a dealer, in providing a service to the public, in making a two-sided market and being obligated to participate on both side [sic] of every public order, taking on this inventory so that I would be able to resell it to the public and provide liquidity in the derivative product, * * * I provided a service to the public * * *
>
>     *     *     *     *     *     *     *
>
>    * * * As a market-make [sic], [I was] providing a

---

[11] In presenting their respective arguments on whether the Gordons are entitled to the claimed 1988 NOL deduction, Mr. Gordon and respondent focus on Mr. Gordon's 1986 net trading loss, and not on the individual components of that loss. Although the applicable sections of the Code address those individual components, for convenience, we, like the parties, shall focus on Mr. Gordon's 1986 net trading loss since it is immaterial to our resolution of the issue presented whether we address that loss or its individual components.

service to the public, being placed in a position of taking on massive positions, responding to public orders, [and] * * * my motivation was not wholly for self-profit * * *

        *       *       *       *       *       *       *

    * * * I was a dealer.  * * * I hedged more than 80% of my transactions and all of my inventory was taken on so that the public interest could be served. All of this inventory was for resale and allows [sic] me under Public Law 98-369 [the Deficit Reduction Act of 1984] to report gains and losses as ordinary.

To support her contention that Mr. Gordon's 1986 net trading loss is a capital loss, respondent asserts:  (1) Pursuant to section 1256(f)(3)(A), that loss, which Mr. Gordon realized from trading options as an options market maker, constitutes a loss from the sale or exchange of a capital asset; (2) the exception in section 1256(f)(3)(B) to the treatment required by section 1256(f)(3)(A) for certain hedging transactions does not apply to that loss; and (3) therefore, pursuant to section 1256(a)(3), 40 percent of that loss is treated as a short-term capital loss and the remaining 60 percent is treated as a long-term capital loss.[12]

Section 1256(f)(3), which is headed "Capital Gain Treatment For Traders in Section 1256 Contracts", provides in pertinent

---

[12]  Respondent also contends, in the alternative, that Mr. Gordon's 1986 net trading loss is a capital loss because it resulted from the sale of options that are capital assets within the meaning of sec. 1221.  In light of our holding that that loss constitutes a capital loss pursuant to sec. 1256(f)(3)(A), we shall not address respondent's contention under sec. 1221.

part:

(A)  In general.--For purposes of this title, gain or loss from trading of section 1256 contracts shall be treated as gain or loss from the sale or exchange of a capital asset.

(B)  Exception for certain hedging transactions.-- Subparagraph (A) shall not apply to any section 1256 contract to the extent such contract is held for pur- poses of hedging property if any loss with respect to such property in the hands of the taxpayer would be ordinary loss.

The following legislative history is instructive in constru- ing section 1256(f)(3)(A):

Historically, options market makers on securities exchanges have reported ordinary income or loss from their options transactions as well as from transactions in the property subject to the option.  Commodity traders derive capital gain or loss from their * * * [regulated futures contracts] transactions and are subject to mark-to-market and 60/40 treatment.

*      *      *      *      *      *      *

The House bill changes the claimed present-law treatment of options market makers and codifies present law with respect to professional commodity traders by providing that both categories of traders are treated as buying and selling capital assets, except to the extent that an option or future is acquired to hedge property that would generate ordinary income or loss. An options dealer is defined as any person who is registered with the SEC and an appropriate national securities exchange as a market maker or specialist in listed options.  Under the bill, an options dealer would not recognize ordinary income or loss with re- spect to his stock and securities transactions, unless the taxpayer is a dealer in stock and securities under general Federal income tax rules (determined without regard to whether options in such property produce ordinary income or loss).

In addition to nonequity options, which are marked-to-market in the hands of all holders, equity

> <u>options held by options dealers are also subject to the mark-to-market rule and 60/40 treatment.</u>
>
>      \*     \*     \*     \*     \*     \*     \*
>
>     The conference agreement eliminates the reference to registration with the SEC in the definition of "options dealer" \* \* \*.  Further, <u>the conferees intend that the capital gain or loss status of options traded in the normal course of an options dealer's activity in trading options is to be determined without regard to the identification requirement of sec. 1236.</u>  [H. Conf. Rept. 98-861, at 899, 903, 909, 1984-3 C.B. (Vol. 2) 153, 157, 163; emphasis added.]

See also S. Prt. 98-169 (Vol. 4), at 285, 289 (1984).

Respondent contends, and Mr. Gordon does not dispute, that each of the options that Mr. Gordon traded during 1986 as an options market maker is a "section 1256 contract" within the meaning of section 1256(b)(3) or (4) because each of those options constitutes either a "nonequity option" within the meaning of section 1256(g)(3) or a "dealer equity option" within the meaning of section 1256(g)(4).  Respondent and Mr. Gordon have stipulated that during 1986 Mr. Gordon was registered and operated on the AMEX as a market maker in stock options and index options, all of which were listed and traded on the AMEX and subject to the respective rules and regulations of that exchange and the SEC.  They thus agree that during 1986 Mr. Gordon was an "options dealer" within the meaning of section 1256(g)(8)(A), i.e., a "person registered with an appropriate national securities exchange as a market maker or specialist in listed options." Respondent and Mr. Gordon have further stipulated that (1) a

trader on the floor of an exchange who buys and sells options acts as either a market maker, a specialist, or a floor broker; (2) an options market maker is a trader on the floor of the exchange who buys and sells options either for his or her own account or for the accounts of others and who competes with other options market makers to make a market in various options that are traded on that exchange; (3) as an options market maker, during 1986 Mr. Gordon purchased a particular option at a certain bid price, owned that option for his own account, expected to sell it at a slightly higher offered price, and took a position, that is, held an option, with a profit expectation derived from the fluctuations in the market; (4) Mr. Gordon bought and sold over 50,000 option contracts during 1986 in the normal course of his trade or business as an options market maker; and (5) Mr. Gordon sustained a net trading loss of $319,973 during that year from his activities as an options market maker.

Based on our review of the entire record before us, we find that, pursuant to section 1256(f)(3)(A), the 1986 net trading loss that Mr. Gordon realized from selling options as an options market maker is a loss from the trading of section 1256 contracts that is treated as a loss from the sale or exchange of a capital asset.

As we understand Mr. Gordon's position, he appears to contend that, even if the Court were to find that, pursuant to

section 1256(f)(3)(A), his 1986 net trading loss is a loss from the sale or exchange of a capital asset, that loss nonetheless is an ordinary loss pursuant to section 1256(f)(3)(B)[13] because he "hedged more than 80% of * * * [his] transactions".  To support that contention, Mr. Gordon relies on his general, vague, and conclusory testimony that he used certain options to hedge the risks that were associated with certain other options and that he used common stock to hedge the risks that were associated with certain options.[14]  We are unable to find from that testimony that Mr. Gordon held the options that generated his 1986 net trading loss for the purposes specified in section 1256(f)(3)(B) or that he otherwise fits within that statutory exception to the rule mandated by section 1256(f)(3)(A).  Mr. Gordon has not presented any evidence showing (1) what specific options were held by him during 1986 for hedging purposes and what specific properties were being hedged by those options; (2) the nature of his hedging transactions (e.g., what specific risks were associated with the properties that he claims were being hedged and how

---

[13]  As noted above, sec. 1256(f)(3)(B) provides an exception to the capital gain or loss treatment required by sec. 1256(f)(3)(A) in the case of "any section 1256 contract to the extent such contract is held for purposes of hedging property if any loss with respect to such property in the hands of the taxpayer would be ordinary loss."

[14]  Mr. Gordon does not contend and did not testify that he used any of the options in question to hedge the risks that were associated with any of the common stock that he may have owned.

such risks were offset by the options that he claims were being held for hedging purposes); (3) that he held any of the options in question for purposes of hedging property, any loss with respect to which would be an ordinary loss in his hands;[15] or (4) what portion, if any, of his 1986 net trading loss was attributable to such hedging transactions. On the record before us, we find that Mr. Gordon has failed to establish that the hedging exception in section 1256(f)(3)(B) applies to any portion of his 1986 net trading loss.

Having found that, pursuant to section 1256(f)(3)(A), Mr. Gordon's 1986 net trading loss is treated as a loss from the sale or exchange of a capital asset and that Mr. Gordon has failed to establish that he held the options that generated that loss for the purposes specified in section 1256(f)(3)(B), we sustain respondent's determinations (1) that, pursuant to section 1256(a)(3), 40 percent of that loss is treated as a short-term capital loss and the remaining 60 percent is treated as a long-term capital loss and (2) that petitioners are not entitled to the claimed 1988 NOL deduction.

---

[15] We note that, to the extent that Mr. Gordon may have used certain of the options in question to hedge certain other options that are also in question, he would not be entitled under sec. 1256(f)(3)(B) to ordinary loss treatment for any loss from the options that he may have used in such hedging. That is because any loss with respect to the options that were being hedged would not constitute ordinary loss. See sec. 1256(f)(3)(A).

Equitable Estoppel

Mr. Gordon argues that respondent is equitably estopped from claiming that petitioners are not entitled to the claimed 1988 NOL deduction because his 1986 net trading loss constitutes a capital, and not an ordinary, loss. To support his argument, Mr. Gordon contends that (1) the IRS initiated an examination of the Gordons' 1986 return in August 1987; (2) the revenue agent conducting that examination orally informed Mr. Gordon in October 1988 that that loss was properly characterized as an ordinary loss; (3) the IRS issued a no-change letter to the Gordons in May 1989 that formally notified them that the examination of their 1986 return showed that "no change" was necessary in the tax reported in that return; and (4) he arranged his affairs to his detriment in reliance on that oral statement and that no-change letter. Respondent contends that Mr. Gordon has not established the elements necessary to warrant application of the doctrine of equitable estoppel. We agree with respondent.

"Equitable estoppel is a judicial doctrine that 'precludes a party from denying his own acts or representations which induced another to act to his detriment.'" Hofstetter v. Commissioner, 98 T.C. 695, 700 (1992) (quoting Graff v. Commissioner, 74 T.C. 743, 761 (1980), affd. 673 F.2d 784 (5th Cir. 1982)). That doctrine is applied against respondent "'with the utmost caution and restraint.'" Boulez v. Commissioner, 76 T.C. 209, 214-215

(1981) (quoting Estate of Emerson v. Commissioner, 67 T.C. 612, 617-618 (1977)), affd. 810 F.2d 209 (D.C. Cir. 1987). A no-change letter does not necessarily provide the necessary foundation for applying that doctrine against respondent. See Opine Timber Co. v. Commissioner, 64 T.C. 700, 712 (1975), affd. without published opinion 552 F.2d 368 (5th Cir. 1977); Lawton v. Commissioner, 16 T.C. 725, 726-727 (1951).

The following factors must be established in order to apply the doctrine of equitable estoppel: (1) There must be a false representation or wrongful misleading silence; (2) the error must be in a statement of fact, and not in an opinion or a statement of law; (3) the person claiming estoppel must be ignorant of the true facts; and (4) that person must be adversely affected by the acts or statements of the person against whom estoppel is claimed. Estate of Emerson v. Commissioner, supra at 617-618.

Mr. Gordon has failed to show that the IRS revenue agent's oral statement to him in October 1988 that his 1986 net trading loss was properly reported in the 1986 return as an ordinary loss and the IRS' issuance of the no-change letter in May 1989 were misrepresentations of fact, and not mistakes of law resulting from a failure to take into account the change in the law in 1984 that Congress believed it was making with respect to the characterization of gains and losses from the option transactions of options market makers when it enacted section 1256(f)(3)(A) into

the Code.  See <u>Automobile Club of Mich. v. Commissioner</u>, 353 U.S. 180, 183 (1957).

Nor has Mr. Gordon established that he relied to his detriment on the IRS revenue agent's oral statement to him in October 1988 and the IRS' issuance of the no-change letter in May 1989 by arranging his business affairs so that any income that he received during 1988 and subsequent years would constitute ordinary income that could be offset by a net operating loss deduction attributable to his 1986 net trading loss.  In this connection, we find it significant that (1) although Mr. Gordon's employment with MKI from which he received ordinary income during 1988 commenced sometime in January 1988, it was not until October 1988 that the IRS revenue agent told him that his 1986 net trading loss was properly reported as an ordinary loss in the Gordons' 1986 return, and it was not until May 1989 that the IRS issued the no-change letter to the Gordons; and (2) the Gordons did not claim any net operating loss deductions in their 1989 and 1990 returns.

We also reject Mr. Gordon's claim that he relied to his detriment on the IRS revenue agent's oral statement to him in October 1988 and the IRS' issuance of the no-change letter in May 1989 when he and Ms. Gordon did not use his 1986 net trading loss to offset the long-term capital gain that they realized from the sale of their Roslyn residence.  The Gordons realized a gain from

the sale of the Roslyn residence on November 21, 1986, and they purchased the Lincoln Plaza residence on November 9, 1988. We note initially that the Gordons could have used Mr. Gordon's 1986 net trading loss to offset the long-term capital gain that they realized from the sale of their Roslyn residence, regardless whether that loss was characterized as a capital, or an ordinary, loss. Moreover, although the Gordons did not offset the gain from the sale of the Roslyn residence by Mr. Gordon's 1986 net trading loss, they did not have any additional tax liability for 1986 resulting from that gain. Indeed, the Gordons indicated in the Form 2119 included as part of their 1986 return that they planned to replace the Roslyn residence within the "replacement period". Consequently, they did not include any portion of that gain in the income reported in that return. In addition, the Gordons indicated in the amended Form 2119 included as part of their amended 1986 return that they had replaced the Roslyn residence, included in the income that they reported in that return a capital gain of $29,391 from the sale of that residence, and claimed a net operating loss deduction of $35,065 that was attributable to an alleged net operating loss carryover from 1985.

Moreover, we do not believe that Mr. Gordon relied on the IRS revenue agent's oral statement to him in October 1988 and the IRS' issuance of the no-change letter in May 1989 in choosing to

defer the recognition of the gain from the sale of the Roslyn residence, rather than choosing to offset that gain by his 1986 net trading loss. About 18 months before the IRS revenue agent orally informed Mr. Gordon in October 1988 that his 1986 net trading loss was properly reported as an ordinary loss in the 1986 return, the Gordons indicated in the Form 2119 included as part of their 1986 return that they planned to replace the Roslyn residence within the "replacement period". Furthermore, only a few weeks after that agent so informed Mr. Gordon, the Gordons consummated the purchase of the Lincoln Plaza residence.

On the record before us, we find that Mr. Gordon has failed to show that, under the facts and circumstances presented here, the doctrine of equitable estoppel should be applied against respondent. Accordingly, on that record, we find that respondent is not equitably estopped from claiming that petitioners are not entitled to the claimed 1988 NOL deduction because Mr. Gordon's 1986 net trading loss constitutes a capital, and not an ordinary, loss.

## Innocent Spouse

Ms. Gordon claims that she qualifies for innocent spouse relief under section 6013(e)(1) with respect to the portion of the understatement of tax for 1988 that is attributable to the

claimed 1988 NOL deduction.[16]

Section 6013(e) provides in pertinent part:

(e) Spouse Relieved of Liability in Certain Cases.--

    (1) In general.--Under regulations prescribed by the Secretary, if--

        (A) a joint return has been made under this section for a taxable year,

        (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

        (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

        (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial under-statement.

    (2) Grossly Erroneous Items.--For purposes of this subsection, the term "grossly erroneous items" means, with respect to any spouse--

        (A) any item of gross income attributable to such spouse which is omitted from gross income, and

        (B) any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law.

---

[16] Ms. Gordon does not contend that the Gordons are entitled to the claimed 1988 NOL deduction.

The spouse claiming innocent spouse relief must prove that all four requirements prescribed by section 6013(e)(1) are satisfied in order to be entitled to such relief.  Bliss v. Commissioner, 59 F.3d 374, 378 (2d Cir. 1995), affg. T.C. Memo. 1993-390.

Respondent concedes that (1) the Gordons filed a joint return for 1988, (2) there was a substantial understatement of tax in that return with respect to the claimed 1988 NOL deduction that was attributable to Mr. Gordon, and (3) Ms. Gordon did not know, and had no reason to know, of the substantial understatement of tax for 1988 that was attributable to that claimed deduction.[17]  Respondent argues, however, that the claimed 1988 NOL deduction does not constitute a grossly erroneous item under section 6013(e)(1)(B) because (1) respondent did not disallow that deduction, but merely recharacterized it as a deduction for a capital, rather than an ordinary, loss, and (2) even if respondent were considered to have disallowed that deduction, Ms. Gordon has not established that there was no basis in fact or in law for that deduction.  Respondent further argues that, under the facts and circumstances presented here, it is not inequitable under section 6013(e)(1)(D) to hold Ms. Gordon liable for the portion of the understatement of tax for 1988 that is attribut-

_____

[17]  Respondent also concedes that the understatement attributable to the claimed 1988 NOL deduction satisfies sec. 6013(e)(4).

able to the claimed 1988 NOL deduction.

We reject respondent's contention that the claimed 1988 NOL deduction does not constitute a grossly erroneous item under section 6013(e)(1)(B) because that deduction was not disallowed, but was merely recharacterized. That respondent's basis for disallowing the claimed 1988 NOL deduction is the recharacterization of Mr. Gordon's 1986 net trading loss from an ordinary, to a capital, loss does not mean that she is not disallowing that deduction. See Bokum v. Commissioner, 94 T.C. 126, 141-142 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Indeed, respondent determined in the notice (1) that the Gordons are not entitled to the claimed 1988 NOL deduction of $268,318 and (2) that they are entitled for 1988 to a deduction for a capital loss carryover of $7,612 that is attributable to Mr. Gordon's 1986 net trading loss. Accordingly, we conclude that the claimed 1988 NOL deduction will constitute a grossly erroneous item within the meaning of section 6013(e)(1)(B) if Ms. Gordon establishes that that claimed deduction has "no basis in fact or law" within the meaning of section 6013(e)(2)(B). See Bokum v. Commissioner, supra at 141-142; Flynn v. Commissioner, 93 T.C. 355, 364 (1989).

In Douglas v. Commissioner, 86 T.C. 758, 762-763 (1986), we construed the phrase "no basis in fact or law" as follows:

> As we read the statute as a whole and its legislative
> history, a deduction has no basis in fact when the
> expense for which the deduction is claimed was never,
> in fact, made. A deduction has no basis in law when

> the expense, even if made, does not qualify as a de-
> ductible expense under well-settled legal principles or
> when no substantial legal argument can be made to
> support its deductibility.  Ordinarily, a deduction
> having no basis in fact or in law can be described as
> frivolous, fraudulent, or, to use the word of the
> committee report, phony.  [Fn. ref. omitted.]

That a deduction is disallowed does not necessarily mean that it has no basis in fact or in law within the meaning of section 6013(e)(2)(B).  See id. at 763.

Ms. Gordon concedes that Mr. Gordon's 1986 net trading loss to which the claimed 1988 NOL deduction is attributable was, in fact, sustained by Mr. Gordon during 1986.  She argues, however, that the claimed 1988 NOL deduction is grossly erroneous because, pursuant to section 1256(a)(3), Mr. Gordon's 1986 net trading loss to which that deduction is attributable is a capital loss, and, consequently, that loss is not a net operating loss that the Gordons are entitled to carry over to years after 1986.  Respondent counters that the claimed 1988 NOL deduction is not grossly erroneous because it is not frivolous, fraudulent, or phony.

We note initially that Ms. Gordon is wrong in claiming that section 1256(a)(3) mandates capital loss treatment for Mr. Gordon's 1986 net trading loss.  It is section 1256(f)(3)(A), and not section 1256(a)(3), that requires that any gain or loss from trading of section 1256 contracts be treated as gain or loss from the sale or exchange of a capital asset, unless the hedging exception in section 1256(f)(3)(B) applies.  Section 1256(a)(3)

requires only that any gain or loss with respect to a section 1256 contract is to be treated as short-term capital gain or loss to the extent of 40 percent of such gain or loss and as long-term capital gain or loss to the extent of 60 percent of such gain or loss. Indeed, section 1256(f)(2) provides that section 1256(a)(3) is not to apply to any gain or loss which, but for such paragraph, would be ordinary income or loss.

We have found on the instant record that, pursuant to section 1256(f)(3)(A), Mr. Gordon's 1986 trading loss is treated as a loss from the sale or exchange of a capital asset and that Mr. Gordon failed to establish that the hedging exception in section 1256(f)(3)(B) applies to any portion of that loss. Our latter finding does not necessarily mean that Mr. Gordon did not hold any of the options that generated his 1986 net trading loss for the purposes specified in section 1256(f)(3)(B). It means only that although Mr. Gordon claims that he so held most of those options, the evidence that he presented did not persuade us that he did. In contrast, Ms. Gordon does not even claim that Mr. Gordon did not hold the options in question for the purposes specified in section 1256(f)(3)(B), let alone that there was no substantial argument that can be made that he so held any of those options. Ms. Gordon could have developed the record in order to attempt to establish that Mr. Gordon did not hold the options that generated his 1986 net trading loss for the purposes

specified in section 1256(f)(3)(B).  However, she failed to do so.

On the record before us, we find that Ms. Gordon has failed to show that there is no basis in fact or in law within the meaning of section 6013(e)(2)(B) for the claimed 1988 NOL deduction and that that item constitutes a grossly erroneous item within the meaning of that section.[18]

Based on our review of the entire record before us, we find that Ms. Gordon is not entitled to innocent spouse relief under section 6013(e)(1) with respect to the portion of the understatement of tax for 1988 that is attributable to the claimed 1988 NOL deduction.

To reflect the foregoing and the concessions of the parties,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.

---

[18]  Consequently, we shall not address whether Ms. Gordon satisfies sec. 6013(e)(1)(D) with respect to the portion of the understatement of tax for 1988 that is attributable to the claimed 1988 NOL deduction.